Judge Burnet’s
opinion:
The application for a new trial in this case has been argued with great ability by the counsel on both sides. The view they have taken of the question naturally leads to an examination of the following propositions:
1. Did the court err in admitting the defendant’s testimony in the form in which it was offered and received ?
2. Was the testimony submitted to the jury sufficient to prove the legal execution of the deed for the premises in question by John Allen to his son George?
3. If the execution of the deed be proved, did it pass the legal estate in the premises to the grantee ?
1. The testimony objected to, and admitted by the court, consisted of a copy of a deed from John Allen to G. W. Allen, found on the notarial book of R. C. Shannon, dated in October, 1801, attested by two witnesses, acknowledged before the said Shannon, as a justice of the peace, and purporting to convey all the right and title of the grantor, in the premises in question; also a deed of mortgage from G. W. Allen to Langdon, under whom the defendant claims, for the same premises. Also, sundry depositions-going to show, among other things, that at the time the copy of the deed bears date Shannon was a notary and a justice of the peace in the State of New Hampshire, where the transaction took *place; that the entry on his notarial book is in his own handwriting; that he was a man of good character, and that he died a short time previous to the commencement of the present suit. That the persons whose names are found on the notarial copy, as subscribing witnesses, were living in the neighborhood at the date of the deed, were men of good character, and were both dead before this suit was commenced; that J. Allen, the grantor,, had declared that he had executed such a deed to his son; that G. W. Allen and some of his co-heirs had made similar declarations as to the deed; that about the time the deed appeal’s to have-been executed to G. W. Allen, John Allen was at Portsmouth, where Langdon lived, endeavoring to obtain credit for his son G. W. Allen, and spoke of pledging his Ohio lands for that purpose.. That R. 0. Shannon resided and kept his office at Portsmouth *101 that afterward, in September, 1805, George W. Allen mortgaged the same lands to Langdon, and acknowledged the deed before the same R. C. Shannon, at Portsmouth, which original mortgage was produced, duly authenticated, but at the time of its date John Allen was deceased.
The first objection taken to this evidence, by the defendant’s counsel, is that it was offered and admitted in mass, when it ought to have been dissected, and each part offered separately, to support the particular point to which it might-apply, in the following order: 1. To prove the existence; 2. The execution; 3. The loss; and, 4. The contents of the deed.
Although this is the natural order in which the-parts of the general proposition arise, and are usually established, yet I have never seen a rule which required such a careful separation of the •evidence as is here contended for. In many instances it would be impossible to observe such a rule. Evidence relating to two or more points may be so blended in the same transaction as to render a separation impossible; nor do I discover any inconvenience that could arise from the submission of the whole evidence at once. Such a course does not interference with the rule of evidence, that the points must all be made out or sustained in their natural order, because when the evidence is spread before the jury ■their attention may be directed to the different ^points in succession, for the purpose of ascertaining whether they are all sustained or not ; and if not, the defendant will be entitled to the same benefit as if the testimony had been offered by parcels, and there had been a failure in supporting one or more of the points. It is not pretended that the jury were misdirected, or that they were not informed that it was necessary for the defendant to prove the existence, the execution, and the loss of the deed to their satisfaction before he could prove its contents. The fact is that the •case was put to the jury on that ground, and they must have found the evidence sufficient to sustain all the points.
The next inquiry under this branch of the case is, was the testimony, or any part of it, improperly admitted for the purpose for which it was offered. And here it may be premised that the ■deed, in question, did not belong to Langdon, the mortgagee, or to the defendant who claims under him. It was of right retained by Allen, and has been under his control and subject to his disposal. It was his duty to have it recorded- in the proper office, and the *102 omission to do so is not chargeable to the defendant. It may be the result of a determination to suppress the deed for the purpose of defeating the mortgage, and of saving the property for the benefit of the Allen family. It is also a circumstance worthy of notice that the claim now set up by Allen’s heirs has been suffered to sleep more than twenty years, and until the officer before whom the acknowledgment appears to have been taken and by whom the entry was made on the notarial book, and the subscribing witnesses to the deed, are all dead. The defendant is, therefore, reduced to the necessity of proving his case in the best manner he can, and may avail himself of any advantage to which the rules of evidence, founded on general necessity, entitle him.
The parts of the testimony objected to by the plaintiff are: 1. The declarations of John Allen. 2. The declarations of Gr. W. Allen and his co-heirs; and, 3. The copy of the deed on the notarial book.
First. As to the parol declaration of John Allen. I am aware that parol evidence is not sufficient to create a title to real estate, or to transfer a title; but it is sometimes proper and necessary to strengthen or explain transactions, from *which either the existence or the transfer of title may be inferred, and for that purpose it was offered in the present case. The depositions disclose a variety of facts which it is not necessary to recapitulate, but which, taken in connection, were relied upon by the defendant as evidence of the execution of a deed for the land in question by John Allen to Gr. W. Allen. It was to strengthen this evidence that proof was offered of the declarations of John Allen that he did execute the deed at the time, for the purpose and in the manner alleged. These parol declarations of Allen are not considered as having affected his title in any way — they were not offered for that purpose, but to confirm and give greater certainty to the facts from which the actual execution and delivery of the deed was inferred. In Watson’s Lessee v. Criss, 11 Johns. 437, which was cited to show that this evidence was improperly admitted, the plaintiff had made out a perfect title under John Richardson. The defendant produced a deed from William Richardson to himself, and then offered to prove that John Richardson had told his mother that he had conveyed the premises to his father, William Richardson, which was overruled, because there was no evidence of the existence of a deed, nor was there anything from which it *103 could be inferred. Now, from the reason given, this case may b© considered an exception to a general rule; for as the declarations were rejected, because there was no evidence tending to show the execution of a deed, it seems to follow that where there is such evidence, the declarations are to be admitted. In the case of White's Lessee v. Cary, 16 Johns. 304, the declarations of the defendant were liable to the same objection. It was not pretended that she had convoyed her estate in the premises—-there was no evidence to that effect. The declarations she had made could not be considered as amounting to anything more than an expression of her own opinion, as to the legal operation of the deed under which-she held. But the court put the case entirely on the ground of the statute to prevent frauds and perjuries, and rejected the evidence, because it was in defiance of that statute, so that the ground of the decision has no bearing on the case in hand, because the deed in question, and the declarations in relation to it,-were alleged to have been made in 1801, and the statute against frauds and ^perjuries was enacted for the first time in the State of Ohio, in 1810. In the case of Jackson v. Bard, 4 Johns. 230, cited by defendant, it was ruled that the declarations of a person, while in possession, as to his title, are good evidence against himself and all persons claiming title under him.
In Young’s Lessee v. Vradenbergh, 1 Johns. 159, it was decided that the declarations of one, who had given a deed with warranty, though not admissible to sustain a title derived from such deed, might be given in evidence to show in what character or with what intent such person entered and held possession.
In Waring v. Warren, 1 Johns. 340, the court decided that the declarations of a tenant were never received in evidence to support his title, though they might be received against it.
In Fearn v. Taylor, 3 Bibb, 363, it was alleged that the deed from the patentee to the appellants had been lodged in the clerk’s office to be recorded, and that it had been burnt with other papers in the office. The facts being sworn to, the court admitted the acknowledgment of the grantor as evidence of the execution of the deed. The cases, cited from 4 Binney, relate to the effect of the recital in the deed of mortgage from Gr. W. Allen, and sufficiently show that his heirs, so far as they claim under the title of their father as one of the heirs of John Allen, are estopped by the recital, but I do not see that they have any bearing on the *104 title of the lessor of the plaintiff, who claims as a co-heir with Gr. W. Allen, and can not be affected by his admissions. But I shall not pursue the authorities cited to this point any further. ' It appears to me that these declarations of John Allen were a part of the res gestee—that they are connected with the transactions which led to the execution of the deed, and which are relied on, in part, .as evidence of its existence.
I am inclined to consider the evidence of the declarations of G-. W. Allen, and of the other co-heirs, as improperly received to prove the existence of the deed ; but admitting it to be so, there was sufficient proof without it, and we do not grant new trials because improper testimony has been admitted, when it was merely •cumulative, and when the jury must have found the fact, as they have done without it.
*Tke object of new trials is substantial justice, and if that has been obtained, it is not common to set aside verdicts on objections stricii juris.
The copy of the deed on the notarial book of Shannon would not be legal evidence by itself. The notary had no authority to record the deed, neither could a copy from his book, nor the book itself, be received in evidence of its existence, or its contents, unaccompanied with other proof; but after a sufficient foundation had been laid from which to infer its existence, the copy on the notarial book, accompanied by such facts as were proved in connection with it, might be admitted as auxiliary evidence.
The doctrine laid down in 1 Starkie on Evidence, 46, 47, which was cited by the plaintiff, does not sustain his objection. That writer gives it as a general rule that mere oral assertions, or a' written entry by an individual that a particular fact is true, can not be received in evidence; but he cites a number of cases where entries possess an intrinsic credit and are admissible in evidence, as for example, where the entry is in itself a fact and is part of the res gestee, the objection ceases. He confines the objection to entries having no tendency to illustrate the question, except as mere abstract statements detached from any particular fact in dispute, and depending for their effect entirely on the credit of the person who makes them. But he lays it down expressly that if any impox’tance can be attached to an entry as a circumstance which is part'of the transaction itself, deifiving credit from other circumstances independent of the writer, it is admissible. This *105 was the fact in the case before us. The notarial entry was not offered as a mere abstract statement or fact depending for its credit on the character of Shannon, but as a circumstance having •an intrinsic relation to other facts and circumstances contemporaneous pointing to the execution of the deed, and relied on by the defendant as making out a case from which the actual execution of- it might be ascertained. It was one of several facts in the transaction which the defendant was attempting to prove. The acknowledgment of the deed was necessary to its completion. It was proper to acknowledge it before Shannon as a justice of the peace, and he being a notary at the time, it was natural, though not necessary, to record it *among his notarial proceedings. These circumstances, with many others stated in the depositions, form 'the transaction which the defendant was attempting to -establish.
The authorities cited to this point are. numerous, and seem to confirm the inference I have drawn, from the doctrine laid down by Starkie. I will refer to one of them only. Warren v. Greenvile, 2 Stra. 1129, where it was held, that an entry on an attorney’s debt book, after his death, was admitted as a circumstance, material to show a sui’render, there being no reason to believe it was made for the purpose of evidence; and it will be found, •on examination, that the reasons given by the court, apply with much force to the case in hand.
2. The second general proposition is, was the evidence sufficient to prove the legal execution of the deed by the elder Allen? It will be recollected here, that the fact of the execution has been found by the jury, on evidence, which, in the opinion of the court, justified that finding. Our present inquiry, therefore, is, whether the manner of the execution was legal, and whether the matter in the deed was sufficient to pass the title, on the supposition that the grantor had power to make it? This leads us to examine the law -of the Northwestern territory, relating to the sale and conveyance of real estate, by which it will appear that there never has been a time, either before or since the establishment of the state government, when we had not a law of some kind prescribing the mode of such sales and conveyances.
The ordinance of Congress of July, 1787, for the government of the Northwestern territory, was the first legal enactment touching the right of property, in the territory, after it had been ceded *106 by the commonwealth oí Tirginia. It authorized real estate to be conveyed by lease and release, or bargain and sale, signed, sealed, and delivered, and attested by two witnesses. It also required the deed to be acknowledged, or proved and recorded within one year after proper magistrates, courts, and registers, should be appointed for that purpose. And it was declared to be the law of the territory, till altered by the governor and judges, who were vested with legislative powers.
*The provision relating to the acknowledgment, proof, and recording of deeds, evidently required further legislation; accordingly, we find, that in June, 1795, the governor and judges adopted a law from the Pennsylvania code, establishing a recorder’s office. The eighth section of that law re-enacts so much of the ordinance on this subject as was suspended by the proviso. It is silent as to the signing, sealing, delivery, and number of witnesses. It requires the acknowledgment, or proof, to be made before a judge of the general court, or of the court of common pleas, and the deed to be recorded in twelve months, and if not so recorded, it renders the deed void against any subsequent purchaser, for valuable consideration, who shall have his deed first recorded. The law of 1798 made no alteration in the former laws, except that of extending the power of taking acknowledgments to justices of the peace. Neither of these enactments contained any pro vision expressly relating to deeds executed out of the territory.
In 1802, it was represented to the general assembly of the territory, by the governor of the State of Connecticut, that many deeds and conveyances of land, lying within the territory, had been executed in that state under an impression that their jurisdiction extended over the district commonly called the Connecticut Reserve. On this application, a law was passed in January, 1802, declaring, in substance, that all deeds and conveyances of land lying within the territory, which had been executed in another state or territory, and acknowledged or proved according to the laws and usages of such state or territory, “ should be effectual and valid in law, to all intents and purposes, as though the same acknowledgments had been taken, or proof of execution made, within this territory, and in pursuance to the acts and laws thereof, and such deeds so acknowledged, or proved as aforesaid, may be admitted to be recorded,” etc. The section contains a proviso, “ that such depds and conveyances so executed, or acknowl *107 edged, or proven, be recorded within two years after the passage of this act.” It also contains a provision in favor of snch deeds, within the purview of the act, as had been recorded prior to that time.
The deed in question purports to have been executed in the *State of New Hampshire, in October, 1801, having the signature and seal of the grantor, the attestation of two witnesses, and an acknowledgment before a justice of the peace, which was in strict conformity with the laws and usages of that state, as well as with the ordinance and laws of the territory. But it is contended, that inasmuch as it was not recorded in the county where the land was situate within two years, it is void under the proviso above stated. This inference can not be correct, for neither the act of 1802, nor the one to which it is a supplement, contains any other penalty for an omission to record a deed, than that it should be void, as to subsequent purchasers, in certain cases. Such an omission does not affect the deed as between the parties themselves. If it has been executed and acknowledged, or proved, in the mode prescribed, it is valid and obligatory on the grantor, whether recorded or not. If it had not been recorded within the time prescribed, the title of the grantor might be defeated by a subsequent Iona fide purchaser, for valuable consideration, but not by the grantor or his heirs.
The evident intention of the proviso was to give an extended time for recording deeds made out of the territory, and to save-those which had been executed a year or more, without being recorded, from the legal consequences of such an omission; but there is nothing in the proviso from which it can be inferred that the legislature intended to make the omission more penal in this case than in others. The law of 1795 required all deeds to be recorded in one year. The law of 1802 required deeds executed within the territory to be recorded in six months, whilst it gave two years in favor of those that had been executed out of the-territory, but it did not in either case change the consequences of an omission to record within the stipulated time.
The proviso has no relation to the validity of the deed as between the parties. It relates altogether to the acknowledgment, and it enables the grantee, by obtaining the acknowledgment, to make-the deed effectual, as well against subsequent purchasers as against the grantor.
*108 The conclusion, therefore, is that this deed, having been executed and acknowledged in New Hampshire, according to the laws of that state, is valid under the act of 1802, and that the omission to record it does not affect its validity as *Lo the grantor or his heirs. Another objection to the deed is, that it does not profess to convey the title of the land, and that it can be considered only as a contract to convey. The deed itself furnishes a sufficient answer to this objection. It describes the property, represents truly the situation of it as to the title of the grantor, and then grants, bargains, and sells to the grantee, his heirs and assigns forever, all the right and title which the grantor then had, or might thereafter have, in the premises, and contains the usual • covenants of general warranty. It was the opinion of the court .at the trial that this was an executed, and not an executory contract, and that it conveyed the whole right of the grantor, and I have not discovered anything in the argument on this motion to show that opinion erroneous.
The objection seems to be predicated chiefly on the fact that the deed appears on its face to have been executed before the issuing of the patent. If it should be admitted that a patent was necessary to vest such a title as could be conveyed by deed, and that, for the want of a patent, the fee did not pass at the time the deed was delivered, still the objection would not be tenable. Within a few months after the execution of this deed, a patent issued to the grantor, the legal effect of which was to perfect the title of G-. W. Allen, the grantee. By the uniform course of decision, both English and American, the grantor was estopped by his deed from setting up a title under the patent; neither could his heirs, nor any person claiming under him, question the title of the grantee on the ground that the patent was subsequent in date to the deed. If the heirs were at liberty to recover the land because the deed from their ancestor preceded his patent, they would become liable, in consequence of such recovery, to an action on the covenants in the deed, and it is to prevent this circuity of action that they are rebutted by the deed and warranty of their ancestor.
In the case of Bond’s Lessee v. Swearengin, 1 Ohio, 402, this court prevented the heirs of Massie, to whom a patent had issued after the death of their ancestor, but founded on his equitable •title, from questioning the title of one to whom the ancestor had *109 conveyed in his life by deed with general warranty, on the principle that they took by descent, and were in the same situation as if the patent had issued to their ancestor in his life.
*This doctrine of estoppel and rebutter is too well settled to be questioned, nor has the learning and research of the plaintiff’s counsel been able to convince me that it is not strictly applicable to the deed in question.
3. The last general proposition is, whether the deed, admitting that its execution has been sufficiently proved, has passed a legal title to the grantee.
The origin of Allen’s claim to the land in question is found in the resolutions of Congress of April 23, 1783, and April 13, 1785, for remunerating the refugees from Canada and Nova Scotia by' grants of land.
In conformity with those resolutions, Congress passed an act, on April 7, 1798, designating the persons who should be entitled to. remuneration, and providing for ascertaining the quantity of land to which each individual was entitled, to be reported to Congress. The act contains a proviso in these words: “That no claim-under this law shall be assignable until after report made to Congress, as aforesaid, and until the said lands be granted to the persons entitled to the benefit of this act.”
On February 13, 1801, Congress passed an act regulating the grants of land appropriated for the refugees from Canada and Nova Scotia. Section 1 of this act directs the surveyor-general to cause certain fractional townships, which are particularly described, to be subdivided, and declares that they are set apart and reserved for the purpose of satisfying the claim above referred to. Section 2 directs the manner in which the locations shall be made, and provides for granting the patents. Section 3 fixes the quantity of land to which each person shall be entitled, and declares that John Allen shall be entitled to twenty-two hundred and forty acres. The deed to Gr. W. Allen, it will be recollected, was made in October, 1801, and the patent to John Allen issued in April, 1802. On this statement, it is contended that the proviso in the act of 1793 prohibited the deed under which the defendant claims, and rendered it inoperative.
In giving a construction to a prohibitory statute, it is always safe to look at the mischief against which it was intended to - guard. Congress had seen the sacrifices made by the officers and- *110 soldiers of the revolution in disposing of their *land warrants before an appropriation was made to satisfy thorn, and while their value was wholly unknown. When the act of 1793 was passed, the refugee claims were in a similar but more uncertain state. It was not known what quantity of land they would receive, when they would receive it, where it would be situated, or what might be its value. In this state of things, the proviso was .a prudent restraint, intended to operate till the uncertainty should ■be removed. The words of the proviso are, “ that no claim under the law shall be assignable until after report .made, and until the lands be granted.”
The claim given by that law was indefinite and uncertain as to the persons who might be entitled to it, as well as to the quantity, ■quality, situation, and value of the land; and while the claim rested on that law, Allen did not attempt to dispose of it. Rut afterward, the report required by the proviso was made to Congress, and the law of 1801 was passed, which ascertained who were entitled to land, what number of acres each individual should receive, .and in what particular townships it was to be located. That act also set apart the land, and directed the issuing of the patents. "When the law of 1798 passed, the claim of no individual had been recognized. No person had any right but that of petitioning for a gratuity, and the proviso operated on claims of that character; but before the date of Allen’s deed, the claim had been reduced to .a right of ascertained value, the object of the proviso had been accomplished, and the land might be considered as having been .granted within the meaning of the act of 1798, so far, at least, as to remove the restriction in the proviso.
For certain purposes, the law considers that as done which ought to be done. A grant and a patent, which is the evidence of a grant, are not the same thing, though both may be necessary to ■form a perfect title. A patent is not always necessary to perfect a grant. Government may dispose of their property, and pass the fee by statute; and although a patent was directed in this case, Congress had done the last act on their part to perfect the title. No further legislation was necessary for that pur-pose. It is true that an individual can not grant real estate, or pass a title, without the formalities of a deed. The cases, however, are not analogous, nor does it follow as a consequence *that government has rot made a grant, because they have directed a patent, *111 which has not issued. I am aware that, at the date of Allen’s deed, the lot which was to regulate the location, and assign to each his land in severalty, had not been drawn, but this could not prevent the statute from operating as a grant. The lottery, and the right of choice that ensued, was in the nature of a partition, prescribed by Congress to bo made after the passage of the act, and ceuld not diminish or increase the interest granted by the act. Should it be admitted that the townships reserved, contained more land than had been granted to these refugees, still the nature of the grant is not changed, as the title to the residue remained in government, and consinued to be theirs, after the grantees had made their selections in pursuance of the statute, and had obtained their lands in severalty. The amount of these objections is, that government had not granted all the land contained in the appropriated townships, and that the grantees had ■not ascertained the metes and bounds of their several tracts. But it is no objection to a conveyance, that the premises are held in common with government, or with individuals, the whole interest of the grantor being conveyed.
If it had been the intention of Congress to require more to be done than was effected by the act of 1801, before the assignment could be legally made, they would, most probably, have used the term patent, instead of grant, in the proviso which creates the restriction.
Another view that may be taken of this question is, that the prohibition operated on the property, and not on the person, and may be assimilated to common law provisions of the same character ; as for example, by the common law, a chose in action can not be assigned, yet such an assignment, so far from being attended with a forfeiture, is protected in equity, and in some eases at common law. The act affixes no disability to the person, nor does it provide any penalty, or forfeiture, in case of an assignment. The words of the proviso are, “ no claim under this act shall be assignable, until,” etc. The restriction, therefore, is on the claim, or the thing claimed, and can not be viewed in the light of a disability, attaching to the person, as infancy, coverture, or the like, nor does this conveyance stand on the ground of an act prohibited, as being against public policy or good morals. There is not ^anything in the transaction itself) or in its consequences, that can affect ■either. It is rather like a restriction in a contract, which may be *112 Insisted on, or abandoned by the party who has imposed it. As if a person covenants to sell and convey a tract of land, provided the covenantee does not assign it. If the covenantee does assign, the covenantor may refuse to convey; but if he does not insist on the condition, but conveys the land, the conveyance will be good. 2 Serg & R. 507. So here, if the conveyance was made, before the restriction was removed, government might have taken advantage of it, but they did not choose to do so. They waived the restriction, by perfecting the title, and have left the common law to do-its office, as between the patentee and his grantee.
By the deed to G. W. Allen, no forfeiture was incurred, and if there had been, it would not have altered the case, for the forfeiture must have been to the government, and could not affect their right to convey, or impair the validity of their patent: But if neither-of these grounds be tenable, the defendant must be protected by the doctrine of estoppel. The lessor of the plaintiff, as one of the-heirs of John Allen, is bound by his covenant of general warranty, in the deed to G. W. Allen, under whom the defendant claims. Privies in. blood, as the heir, are bound by and may take advantage of estoppel. Co. Lit. 352, a.
There is nothing, I apprehend, in the form or the matter of this-deed, that can prevent the operation of this doctrine. The gz-antor professes to convey all his right and title to a specific quantity of land, and covenants that he will warrant and forever defend the-title. Now if that instrument did not convey a title, either in consequence of the restriction in the proviso, or otherwise, the grantor was liable on his covenant, and so must be his heirs. If the lessor of the plaintiff, then, be permitted to recover in this action, he will, in consequence of thao recovezy, bo liable to an action on the covenants in the deed, under which the defendant holds; and so a circuity of action must be produced ; but wherever that-consequence would follow a recovez-y, by an heir, against the deed and covenant of his ancestor, the heir is rebutted.
Motion overruled.
*Judge Sherman’s
opinion:
The questions made upon the motion for a new trial in this case are, whether the evidence offered of the existence, execution, and contents of the alleged deed, fz'om John Allen to G. W. Allen, was-admissible, and if so, whether the said deed was duly executed,., *113 and if were, whether it was not void as against a statute of the United States.
The first objection taken to the testimony is, that it was offered and received in mass. It is, unquestionably, the better course, where a deed is alleged to be lost, or destroyed, to give evidence in the first place of its execution, as this comes in lieu of its production, when in possession of the party; and regularly to pursue the chain of testimony, by giving secondary proof of its due execution, loss, and contents. But these facts are so intimately blended together, and have such a mutual relation to, and dependence upon each other, that it is difficult and many times impossible to separate the proof, one part from the other. The existence of a deed not produced, can rarely be shown without some evidence of its execution and contents; and it is sufficient if it appear bj> direct proof, or fair inference, that a deed under which the party claims, once had an existence, was duly executed, and has been lost or destroyed, to let in proof of its contents. It is not to be expected in every case, nor is it necessary that direct testimony should be given to establish each link in the chain of proofs peculiarly applicable to it, as a distinct and independent fact. When, as in .this case, depositions have to be taken in a distant country, it is usual and proper that the witness should- state, in one deposition, his knowledge of the existence, execution, loss, and contents of the deed. Courts have presumed the existence of an ancient deed, from the fact of there being a copy, and of course such copy must have been the only evidence of the existence, execution, and contents. Phil. Ev. 401-403. In this case, the deed under which the defendant claimed, was executed (if it ever existed) in 1801, in New Hampshire. The grantor, grantee, witnesses, and justice of the peace, who took the acknowledgment, being all deceased, that direct proof of the execution of the deed, which in ordinary cases might be required, can not in this be expected. There must be proof of the existence and execution of the deed ; but if *that proof is blended with, and offered at the same time, and in connection with evidence' of the contents of the deed, the testimony is not thereby rendered inadmissible.
The next question is, as to the competency of' the declaration of John Allen, the grantor, to prove the existence and execution of the deed to G-. W. Allen. The plaintiff claims as one of the heirs at law of John Allen, and insists that he died seized of an estate *114 of"inheritance, in the premises in controversy, which descended, to her and her co-heirs ; she, therefore, stands in the same situation as John Allen would, had he brought an ejectment during his life ; she claims under, as well as through him, and any testimony competent against him is equally so against her. That the declarations of John Allen would have been good against him to show the existence of a deed alleged to be lost, is, I think clear, both upon principle and authority. It is the declaration of a party, made directly against his own interest, and the truth of which he must have known. The declarations of deceased tenants have been frequently admitted to show that they held as tenants, and the recitals in a deed against the party making the recital, and those claiming under him. These declarations were made about the time the deed was executed, and repeated subsequently; nor did the grantor, John Allen, after the execution of the lost deed, exercise any acts of ownership over the premises, but spoke of having conveyed his Ohio lands to his son. If upon no other ground, yet upon the principle of necessity, these declarations would in this case be admissible to show the existence and execution of the lost deed; for, in considering this question, we must assume the deed to be lost. The subscribing witnesses and justice of the peace, who took the acknowledgment, are shown to be dead, and the ■deed lost, so as almost to preclude the possibility of proving their handwriting to the lost instrument, or that of the grantor. The deed being executed in a distant country, and never placed on record in Ohio, shows that it must have been difficult, if not impossible, to find any person who had ever seen it, and was acquainted with the handwriting of any of the persons who subscribed it. Under such circumstances, the declaration of the .grantor as to the existence of a deed divesting him of his estate in the premises, was the best evidence the nature of the case ^admitted of, and could have reasonably been expected to be in the power of the party. The case of Jackson, ex dem. White, v. Ann Cary, 16 Johns. 304, cited and relied on by the plaintiff’s ■counsel, bears no analogy to this case. The plaintiff there offered the parol declarations of the defendant that she had no other interest or title in the lands in dispute than what was given by a ■certain deed, and that, by the legal construction of that deed, she supposed she had a life estate .in the premises, and nothing more. '.The court say, that the declarations of the defendant respecting *115 the title avail nothing; that parol proof has never been admitted to destroy or take away title, and that the defendant can not be divested of what appears to be a complete legal title by her parol declarations. Here the declarations of John Allen were not offered, either for the purpose of divesting him of a legal title, or showing that he never had title, or the extent of his interest in the premises, by his construction of a certain deed, but to prove a fact, the existence and execution of a deed alleged to be lost, which it is competent to show by parol proof. The distinction is obvious between giving to the parol declarations of a party, that he has no title to lands, the effect to divest him of what appears to be a complete legal title, and admitting the declarations of the parly as evidence of a fact, which, from its very nature, must be shown by the testimony of witnesses.
The declaration of the co-heirs of the lessor of the plaintiff, were permitted to go to the jury as corroborative proof of the existence of the deed from John Allen to G. W. Allen. After hearing the argument (for none was submitted at the trial), and looking into authorities applicable to this point, in the cause, the court entertain doubts of the competency of this testimony; but, from the view they have taken, it is not necessary to determine the question of its admissibility. These declarations were received, as corroborating other proofs of the existence and execution of the deed. They were not, nor could be‘ used, for any other .purpose, as they did not tend, in the least, to establish any other fact in dispute between the parties. They were, in the strictest sense, cumulative to the other proof, showing the existence of the deed from John Allen to his son, and, upon a careful revision of that testimony, the court are of *opi onion, that the jury would not only have been warranted, but must have felt themselves bound to find the existence and execution of that deed, although the declarations had not been received in evidence. The testimony going to prove those facts was unexplained and uncontradicted, full and ample, independent of the declaration of the co-heirs. The granting of a new trial rests in the sound discretion of the court, and generally, when incompetent testimony has been received, the court will award a new trial, if the verdict be against the party objecting to such testimony. This rule, like all general rules, is subject to some exceptions, as when the matter in dispute is of trifling amount. So in this case, when the trial has *116 been had before a full court, and the testimony objected to, if improperly admitted, is merely cumulative, and without it the jury would, in the opinion of the court, have been bound to find the fact as they did, a new trial will not be granted. It would answer no valuable purpose, as upon the second trial, the finding of the-jury must be the same, as respects the existence and execution of the deed from J. Allen to Gr. W. Allen, although the court should then be of opinion, that the declaration of the co-heirs of the lessor of the plaintiff could not be received in testimony.
The next question is, whether the original book of R. C. Shannon, a notary public, is, under the circumstances of the case, competent evidence to prove the contents of the deed from John Allen to G-. W. Allen. When a deed is lost and the subscribing witnesses-dead, it is impossible, in most cases, to produce proof of their handwriting to the attestation, by persons acquainted therewith, and who had seen the deed. The usual rules of authenticating deeds must, from necessity, be dispensed with, in such cases, and evidence admitted of such collateral facts as will furnish a fair presumption of the execution or contents of the lost deed. The cases are numerous where the entries in the books of deceased persons have been admitted as evidence. 2 Strange, 1129; 2 Burr. 1071; 4 Term, 514, 669; 7 East, 289; 1 East, 109; 2 Campb. 305, 379; 15 Mass. 381. In Lessee of Reece v. Robson, 15 East, 32, Lord Ellenborough, in speaking of the entries of charges made by a deceased attorney, in his books, showing the time when a., certain lease, perhaps for a client, was executed, observes, “ the ground upon which this evidence *has been received is, that-there is a total absence of interest in the person making the entries, to pervert the facts, and. at the same time a competency in them to know it.” In the late case of Buller v. Michell, 2 Price, 299, it was held that a book purporting to be a ledger-book of the; abbey of Glastonbury, preserved among the muniments of the Marquis of Bath, the owner of some estates, formerly belonging to the abbey, though not of the form in question, and which contained, among other things, a copy of the endowment of a vicarage, by the abbey, might be used in evidence. The court, after stating the ground on which the original document would have been evidence, observes, that search had been made, and the original could not be found, and if they should shut their eyes to this sort of inferior evidence, in cases where no other could be *117 found, they would constanly do injustice. The copy was presumed to be correct, as no motive appeared to make it otherwise, and that such an original document did once exist was inferred from the copy found in the old ledger. In Nichols v. Webb, 8 Wheat. 326, the Supreme Court of the United States held that the books of a notary public, proved to have been regularly kept, are admissible in evidence, after his decease, to prove a demand of payment and notice of non-payment of a promissory note, although those acts were not strictly official, since, say the court, he acts as a public officer and is clothed with public authority and confidence. In Garwood v. Dennis, 4 Bin. 314, the Supreme Court of Pennsylvania admitted, in evidence, the copy of a deed alleged to have been lost, taken from the records of Newcastle county, Delaware, although the deed had not been so executed as to entitle it to have been recorded in the State of Delaware, and, of course, could not be. considered as a record giving publicity and affecting purchasers; but from the improbability that the recorder would have placed it upon record, without having seen and carefully compared it with the original, from which a fair presumption might arise that such original did once exist. The notarial book of Shannon offered and received in this case contains the entry, or copy of a deed, purporting to have been executed by John Allen to G. W. Allen, at Portsmouth, New Hampshire, on October 8,1801, attested by two witnesses, the next, day acknowledged before Shannon as a justice *0f the peace, and recorded the same day in his notarial book. It is accompanied with depositions showing the .good character of Shannon; that he was at that time a justice of •the peace and notary public; that the entry of the deed as well .as many pages before and after it, are in his handwriting; that the persons purporting to be witnesses were residents of Portsmouth, in October, 1801; that J. Allen, whoso residence was in Eastport, in Maine, was at Portsmouth about that time, said he was about to convey his Ohio lands to his son, Gr. W. Allen, and .afterward observed he had conveyed them; that Gr. W. Allen was residing, at that time, in Portsmouth, and that Shannon, the persons purporting to be witnesses to the deed, and both the Aliens, .are since deceased.
There is no direct or positive testimony that the copy contained in the notary book of Shannon is a true copy of the original deed; but there is a strong chain of circumstantial testimony *118 to prove its correctness. The existence of a deed, between these parties, had been previously shown, and that deed, if not destroyed, was in the hands of those claiming adversely to it. The copy was made by the judicial officer, who took the acknowledgment of the grantor, and who, consequently, must have known that it was a genuine deed, was copied by him in his notarial book, at the time it purports to have been made, as is apparent from the date of the prior and subsequent entries, and recorded by him in-his official capacity as notary public, though not regularly in the line of his official duty. We are satisfied that the book of the-notary public, under the circumstances and connected with the1 other proofs in the' case, was admissible as presumptive evidence-of the contents of the deed, from John Allen to G-. W. Allen, the existence and loss of which had been previously shown, although this copy was made, by an officer authorized by law to record deeds, nor its correctness proved by the oath of any person who had compared it with t he original.
Deeds to convey lands, or any other instrument, in any way affecting the title of real estate, must be executed in the manner prescribed by the laws of the country where the lands are situate, and if the deed from John Allen to Gr. W. Allen fails in any essential required by law, to make it a valid conveyance, it should not have been admitted to the *jury. The objection is, that the act of the territorial government, of 1795, adopted from Pennsylvania, entitled, “ a law establishing the recorder’s office,” 3 Ter; L. 133; Ohio L; L. 301, required all deeds to be acknowledged or proved before certain judicial officers of the territory, and recorded in the county where the lands are situate, and that the deed from J. Allen to Gr. W. Allen was not acknowledged, proved, or recorded in the manner prescribed. The ordinance of 1787 points out the mode in which real estate in the territory shall be conveyed, until the governor and judges shall adopt laws providing-therefor, and it was not until 1805, after the state government had gone into operation, that any act was passed for the avowed purpose of regulating the manner of executing deeds for lands; the laws of 1795,1798, and 1802, being obviously, as well as professedly, for the purpose of providing for the acknowledgment and recording of deeds.
The law of 1795, after providing for an office of record in each county, the appointment and qualifications of a recorder, enacts *119 that “ all deeds and conveyances which shall be made and executed in this territory, of, or concerning any lands, etc., shall be acknowledged by one of the grantors, or proved by one or more of the subscribing witnesses, before one of the judges of the general court, or one of the justices of the court of common pleas, of the-county where the lands do lie, and shall be recorded,” etc., “ and every such deed which shall not be acknowledged or proved, and recorded as aforesaid, shall be adjudged fraudulent and void, against any subsequent purchaser for valuable consideration.” This statute' was evidently intended to enforce the recording of deeds executed within the territory, under the penalty of their being adjudged void against a subsequent purchaser, without notice. It is limited, by its terms, to deeds executed within the territory, and to those deeds, although not acknowledged or recorded, full effect is to be given, as between the parties and all others, except subsequent purchasers for a valuable consideration. It would be a forced construction of the law to give it the effect of rendering invalid all deeds for lands situate within the territory, even between the parti es, unless executed and acknowledged within the territory. It was the policy of the territory to facilitate, rather than prevent the sale and conveyance *of lands by non-residents, and the expression of the law should be clear and unequivocal, to justify a court in so construing it, as to require all conveyances of li^nd to be executed within the territory. Deeds acknowledged or proven, in the manner pointed out by the law, may be recorded, and the grantee thereby acquires a sure protection against any subsequent conveyance by the grantor. But the law does not prescribe a mode of executing deeds conveying lands. It leaves that provision of the ordinance of 1778 untouched, and it isby virtue of that ordinance that signing by the grantor, and attestation by two witnesses, was as necessary as sealing, to give validity to a deed conveying real estate. The act of 1802 relates to deeds executed out of the territory. The first section (the only one at all applicable to the case) provides that deeds, out of the territory, that have been, or that may be acknowledged or proven, may be admitted to record, in the counties where the lands are situate, provided such deed be recorded within two years from the passing of the act. Its effect is to extend the protection afforded the grantor, by recording his deed, to cases not provided for by the act of'1795. The deed, if properly executed, is good between the parties, although not re *120 ■corded ; if acknowledged and recorded within the limited time, it would be good against subsequent purchasers, for valuable consideration, without notice of such senior deed. The courts of Pennsylvania, from whose code the law of 1795 was adopted, have, it is believed, uniformly held that the deed, as between the parties, was valid without acknowledgment, but could not be admitted to record so as to protect the purchaser against a subsequent bona fide conveyance. 5 Serg. & R. 252; 2 Ld. Raym. 47; 2 Bin. 562. By section 3 of the act of 1805, providing for the execution and acknowledgment of deeds, it is enacted that all deeds before that time ■executed, for lands within this state, that had been proven or acknowledged according to the laws of the state where executed, should be valid and effectual in law, and might be recorded in the proper county. The deed from John Allen to G-. W. Allen, if the notarial copy be taken as correct, was executed and acknowledged in strict compliance with the requisitions of the ordinance of 1789, the act of the Ohio legislature of 1805, and the law of New Hampshire *(the state where it was executed) in force at the time ■of the execution, acknowledgment, and delivery of the deed, as appears by a duly certified transcript of the laws of that state, relating to the execution and acknowledgment of deeds.
It is also objected that admitting the deed from J. Allen to Gr. W. Allen to have been duly proven and executed, so as to convey lands in the State of Ohio, yet it conveyed no estate, and was, in its origin, void, as against a statute of the United States; and if not void, would operate only as a covenant to convey, and not as a conveyance.
The act of Congress of April 7, 1798, entitled an act for the relief of the refugees from the British provinces of Canada and Nova Scotia, after providing that the secretary of war should give notice to persons having claims under certain resolutions of Congress, to transmit to the war office a true account of their •claims; pointing out the mode of taking the necessary proof, contituting a board to examine the testimony, and give their judgment what quantity of land ought to be allowed to each claimant, and report thereon to Congress, contains this proviso : “ That no claim under this law shall be assignable, until after report made to Congress, as aforesaid, and until the said lands be granted to the persons entitled to the benefit of this act.”
By an act of Congress, passed February 18, 1801, the surveyor- *121 .general was directed to cause certain fractional townships to be subdivided into half sections, of three hundred and twenty acres each, and it was directed, “ That the said lands be, and they are hereby set apart and reserved, for the purpose of satisfying the claims of persons entitled to lands, under the act entitled an act for the relief of the refugees,” etc. Section 2 provided for the location of the lands, and directed that the patents for the lands thus located, should be granted in the manner directed for military lands. Section 3 provided that each person therein named, should be entitled to the quantity of land set against his name, among whom, J. Allen was named, as entitled to twenty-two hundred and forty acres. After the passage of the act of 1801, and before the locations had been made, or the patents issued, J. Allen conveyed all his interest in the lands so set apart and reserved, to Gr. W. Allen, with covenants of seizin, quiet enjoyment, and warranty; and the ^question is, whether such deed be inoperative and void, as against the statute of the United States.
Before the act of 1798, for the relief of the refugees, the practice had became common, of assigning the claims which individuals had upon the bounty of government, although the resolutions and acts promising the bounty contained provisions intended to guard against such transfer. The proclamation of 1763 required the personal application of the officer or soldier, for a grant of land promised therein, yet these claims were frequently assigned, and the assignment held to vest at least an equitable interest. 3 Dali. 425. A resolution of Congress, of September 20, 1776, the first •offering a bounty in land, provides, “ That Congress will not grant lands, to any person or persons claiming under the assignment of an officer or soldier.” The object of Congress was to encourage officers and soldiers to serve in the army during the war, by the promise of a bounty in lands, to be granted to them personally, as a provision for their support. ' Yet such was the condition of the ■officers and soldiers, that many of them were compelled to assign their claims upon the bounty lands, to furnish the means of immediate subsistence, and such assignments were recognized by Congress, by the act of 1788, directing the secretary of war to issue warrants for bounties of land to the officers and soldiers and to their assigns. It is a part of the history of the country that •claims of every description, growing out of the war of the revolution, were constantly assigned, and Congress, in many instances, *122 had previous to the act of 1798, containing the proviso in question, recognized the right of the assignee. It was not, therefore, in consequence of any general principle or policy of the previous legislation of Congress, that the proviso in question was introduced; but the reason of it is found in the character of the claims described in the statute. The board of officers instituted to examine the testimony of the claimants were to report to Congress-•what quantity of land ought to be allowed to the individual claimants, “in proportion to the degree of their respective services, sacrifices, and suffering in consequence of their attachment to the cause of the United States,” and, upon such report, Congress was to determine with what quantity of land they would reward each claimant. A claim more indefinite and ^uncertain can scarcely be imagined. It was for services, sacrifices, and suffering that the refugees were to be rewarded, after deducting any previous-compensation they might have received. A claim so uncertain in amount could never be assigned for a fair equivalent consideration. The refugee, until report made, and the lands granted, would not know the extent of the bounty he should receive, and, therefore, could not know or ascertain its value; and the purchaser, if a purchaser could be found, must guard himself against probable loss, by the smallness of the sum he would pay. The-proviso in question was, therefore, probably introduced into the act to guard against gambling in these uncertain interests, and to-prevent the objects of public bounty from parting with their claims for an inadequate consideration, as well as to relieve the-officers of government from the labor and responsibility of examining and determining the fact and validity of assignments.
Whatever was the intent of Congress in introducing the proviso into the act, it is at least doubtful whether, by any fair rule of construction, any other or greater effect can'be given to it than a. direction to the officers of government, to disregard all assignments in examining the claims and issuing patents, leaving the. effect of such assignments, as between the claimant and third persons, to be determined by the principles of the common law, applicable to claims capable of being made the subject matter of a contract. In such a case, when the claim was of land, and the assignment by deed, with covenants of warranty, the assignor or grantor would be estopped by his covenant from avowing that hallad, at the time of the assignment, no interest, or no assignable *123 interest in the thing granted. The proviso was not intended, nor can it be construed to operate upon the person of the claimant, rendering him incapable in law of making any contract respecting his claim, and bears no just analogy to the cases to which it has been assimilated, in the argument of conveyances by an infant non compos, or Indian, whom the law holds inops consilii, and incapable of binding themselves by deed. But so far as it can have any effect, as between the claimant and third person, it must be because it operates on the estate, the subject matter of the gift, making the donation of land depend on the condition that the claimant does not assign his claim before the lands should be granted. In *this view the interest which the refugee would have in the bounty land would depend upon a condition that he should not assign before he obtained a grant. A breach of this condition by the claimant would be a forfeiture of his claim to the bounty land, of which the government might take advantage by refusing to issue a patent; but a conveyance by deed by the claimant, although it might involve a forfeiture to the government of his claim, would, nevertheless, be good as against him by estoppel. Plow. 234, 430, 434; 2 Serg. & R. 507.
But it is unnecessary to determine what would have been the effect of the proviso, if the conveyance from J. Allen to Gr. W. Allen had been made before the act of February 18, 1801, as we are of opinion that that act amounted to a granting of the lands, within the true intent and meaning of the proviso in the act of 1798. It has already been observed that the restraint imposed upon assignments until “ lands be granted to the persons entitled,” was intended to guard against the mischiefs resulting from speculating in claims of so uncertain a character; and the expression used should, if possible, receive such a construction as will effectuate the intent of Congress without continuing the restriction, after the reasons which induced its imposition- had ceased to exist. The act of 1801 removed every objection to the free alienation of this property, that could have influenced Congress in imposing the restriction. The persons entitled are named, and the number of acres which each claimant should receive, as the bounty of Congress, was fixed by that act. A tract was selected from that immense body of land then owned by the United States in the western country, and set apart to satisfy those claims. A mode was pointed out by which the ministerial officers of govern- *124 merit were to cause locations to be made, and patents were, without any further act of the legislature, to issue for the lots so located.
The terms grant and give, are frequently used by Congress in the same sense, and when they could not intend a patent to issue for the lands so granted or given. By the ordinance of May 20, 1785, lot No. 16 of every township is “reserved” for the use of schools, and by the ordinance of 1787, the same lot is “given” for the same purpose, and lot 29 “given” for the purpose of religion. In the act ot April 20, *1802, “it is enacted that section No. 16 in any township shall be ganted,” for the use of schools. And these expressions frequently occur in the acts of Congress providing for the support of the gospel and schools; and in none of these cases was it ever in the contemplation of the legislature that patents should issue for these lots in order to vest in the state or township a right to use them for the purposes for which they were given. The words of the proviso in the act of 1798, “ granted to such persons,” are more appropriately fitted to express the general appropriation or grant of lands to satisfiy the claim' of refugees collectively than the issuing of a patent to the individual claimant. If the individual grant or patent had been intended, a more appropriate expression, “granted to such claimant,” or other words peculiarly applicable to the individual refugee, and not to the whole body of the claimants, would have been used. Some other legislative act, beside the law of 1798, was evidently contemplated, for a report of the claims was to be made to Congress, by the board constituted to examine the testimony; and without such act, the claimants could never receive the promised bounty. The provisions of the act of 1798, taken together, furnish grounds for fairly inferring that the legislature, when they used the expression, “ granted to the person,” had in view' the setting apart and appropriating a tract of land from the great body of lands then owned by.the United States, to satisfy the claimants, after their claims had been ascertained, and fixed: an act necessary to be done thereafter by Congress, to carry into effect their previous resolutions and laws. The term granted is here used in the same sense as given. A bounty in lands was promised to be thereafter given to the refugees. By whom was this gift to be made ? By Congress, the only body that possessed the power of bestowing the promised bounty upon the claimants; and it is to their future contemplated legislative act of conferring this bounty that this proviso refers, and not to the min *125 isterial act of issuing the patent. The act of 1801, having fixed the-quantum of land to which each claimant was entitled, and set apart and reserved a tract, in which each claimant’s land was to-be located, may well be considered as a granting act of the legislature, for the land bestowed upon the refugees, within the meaning *of the proviso in the act of 1798; and the provision that patents shall be granted, as directory to the proper ministerial officers, to issue the customary and proper evidence of the title of each claimant to the lands granted him by that act.
The deed from John Allen to G-. W. Allen can not be considered-as a mere covenant to convey. It has all the requisites of an absolute conveyance, and was certainly understood as such by the parties. The circumstance that it does not contain any specific description of the section or tract of land intended to be conveyed,. will not so change the force of terms, which, it is admitted, would otherwise convey a fee, as to make them operate only as a covenant to convey. The deed recites the grantor’s claim to the land under the act of 1801, and conveys “ all the right, title, and claim ” which he had, or might thereafter obtain, with covenants of seizin and warranty. The description of the estate conveyed is sufficiently definite and certain, taken, as it must be, in connection with the recitals in the deed, to which the words of description refer. No one can doubt, after looking into the deed, that it was the intention of J. Allen to convey all the interest he had acquired in the-refugee lands by the act of 1801, and the words he used are sufficient to effectuate his intention by passing to his grantee his - estate.
John Allen having, at the time he executed the deed to G-. W.Allen, an interest in the refugee lands, which he was not prohibited-by law from selling, and having conveyed with covenants of general warranty, the subsequent issuing of a patent to him for the - land now in controversy, in fee and in severalty, will inure to the benefit of his grantee, and he is estopped; and his heirs, to prevent circuity of action, are rebutted by his covenants from denying that he had title to the particular tract described in such' patent.